**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 1:22-cv-21193-XXXX**

BAN LILLEY,

      Plaintiff,

vs.

G2 SECURE STAFF, LLC,
and MIGUEL A. OSPINA, Individually,

      Defendants.

_____/

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff BAN LILLEY, by her undersigned counsel, Derek Smith Law Group, PLLC, hereby complains of Defendants G2 SECURE STAFF, LLC ("**G2 Secure**") and MIGUEL A. OSPINA ("**Ospina**"), individually, (collectively, "**Defendants**"), and alleges as follows:

## INTRODUCTION

1.     Plaintiff Ban Lilley brings this action for damages against Defendant G2 Secured pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("**Title VII**"), and the Florida Civil Rights Act of 1992, §760.01, *et seq.*, Florida Statutes ("**FCRA**"), and seeks damages as against Defendant Ospina under common law torts.

## JURISDICTION AND VENUE

2.     The Court has jurisdiction over this action under 28 U.S.C. § § 1331 (federal questions), 42 U.S.C. § 2000e-5(f)(3) (Title VII), and §1367 (supplemental jurisdiction).

3.     Venue is proper in the Southern District of Florida under 42 U.S.C. § 20003-5(f)(3) and 28 U.S.C. § 1391(b) because a substantial portion of the acts or omissions giving rise to this action occurred in the Southern District of Florida.

## PARTIES

4.    Plaintiff Ban Lilley is an individual residing in Miami-Dade County, Florida.

5.    Defendant G2 Secure Staff, LLC, ("**G2 Secure**"), is a foreign limited liability company duly, with a principal address at 400 E. Las Colinas Blvd, Suite 750, Irving, TX 75039, and existing under the laws of Florida.  Respondent G2 is a subsidiary of American Airlines, with its principal place of business in Irving, Texas.  Respondent G2 provides professional aviation service solutions ranging from ground handling services to customer assistance services and security solutions.

6.    Defendant G2 is an "employer" within the meaning of FCRA § 760.02(7) and 42 U.S.C. §2000e(b) because Defendant employed 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

7.    Defendant Miguel Ospina is an individual who, upon information and belief, resides in Miami-Dade County, Florida.

## ADMINISTRATIVE PREREQUISITES

8.    Plaintiff has complied with all administrative requirements.

9.    On or about May 5, 2021, Plaintiff timely dual-filed a charge of discrimination (Charge Nos. 510-2021-04122; 510-2021-05549) with the U.S. Equal Employment Opportunity Commission ("**EEOC**"), and the Florida Commission on Human Relations ("**FCHR**"), naming G2 Secure as the Respondent.

10.    On or about February 11, 2022, the EEOC issued a right to sue notice, and Plaintiff timely filed her complaint within 90 days of receiving her right to sue.

## FACTUAL ALLEGATIONS

11.    Plaintiff Ban Lilley is a 51-year-old woman.

12.    Lilley is the mother of two children, leading a quiet, pious life, choosing to remain single, following the death of her husband.

13.    In or around May of 2018, Plaintiff began working an "Agent" at United's desk at Miami International Airport.  A quadrilingual, Lilley, checked passengers in at United's first-class international desk, which was the most prized assignment, reserved for top-performers at one of the busiest international airports in the world.

14.    Lilley was an exemplary employee.  Lilley received first-rate performance reviews, never missed a day of work, and was admired by her coworkers and supervisors.

15.    Plaintiff wore a United Airlines uniform, held a United Airlines badge, completed United Airlines training in Chicago, and tended to United Airlines travelers every day of her employment for almost three years.

16.    In or around November of 2018, Lilley attended a 10-day training at United's headquarters in Chicago.  United boarded Lilley at its facilities, taught her their unique system, issued a United Airlines uniform, and provided sexual harassment and discrimination training.

17.    G2 did not provide Lilley with sexual harassment training nor informed her of a reporting system of same.

**Supervisor Ospina Makes Relentless, Sexual Advances Over Plaintiff's Repeated Objection**

18.    Ospina began working for G2 at United's desk at Miami International Airport in or around April of 2019 when Silvio Gomez ("Gomez") G2's "Area Manager" hired Ospina as an "Above the Wing Operations Manager."

19.     Upon information and belief, it was well known amongst G2 and United employees that Ospina had separated from American Airlines amid a slew of sexual harassment allegations.

20.     Indeed, Lynn Katoa, ("Katoa") told Lilley of same, as did Eric, and another employee named Varykey, who said, "I can't believe they hired this guy with all those problems."

21.     Ospina became Lilley's immediate supervisor and controlled the terms and conditions of her employment.

22.     From August of 2019 through December of 2020, Ospina initiated a campaign of unwanted sexual advances against Lilley over her repeated objection.  Ospina would lure Lilley into his office to invite her to travel with him.  Ospina would ask her things like, "Do you like to travel?" "Do you want to go to Colombia with me?"  "Please," she would say.  "No, I do not want to go." Ospina would insist, and say, "There's plenty of seafood in Colombia."

23.     Ospina offered tangible job benefits if Lilley accepted his sexual advances.  Ospina said, "I'll do anything.  I'll give you days off.  *Any day you want* … even 'black days,'" which were the busiest travel days of the year, which employees could not take off.

24.     Ospina obsessed over Plaintiff, followed her, and came up with reasons to lure Lilley into his office, which distracted her from work, and affected passengers.  Lilley's supervisors and coworkers began noticing how much time Ospina spent with Lilley.  Paola and Eric would comment on how he hovered over her.

### Plaintiff's Supervisor Launches Retaliatory Campaign, Denies Her Time to Visit Dying Mother, and Interferes with Plaintiff's performance, and Assaults Her at Work

25.     In or around August of 2020, Ospina initiated a series of retaliatory actions against Lilley because she denied his sexual advances.

26.     Lilley repeatedly asked Ospina if she could take leave to care for her sick mother.  Lilley would ask, "May I go see my sick mom in Michigan?"  Ospina said, "Only if I can come

with you and see your family."  At no point did Ospina mention that Lilley was entitled to time off to care for her dying mother.

27.     Throughout September of 2020, Lilley complained of Ospina's sexual harassment and retaliation to multiple managers both locally, and regionally.  Still G2 and United failed to take corrective action.  Lilley would cry to Eric, and say, "Miguel's after me.  He's trying to fire me, [he's] not giving me days off to see my mom."  Lilley complained about Ospina's conduct to Katoa who told Lilley he saw Ospina searching through Lilley's trash can.  Lilley explained to Katoa that Ospina did so to find reasons to reprimand her, but he never found anything to warrant a legitimate write up.

28.     In or around October of 2020, Ospina resumed inviting Lilley to travel to Colombia. This time, however, other employees heard him.  For example, Paola, Plaintiff's coworker, said, "Did [Ospina] ask you to go to Colombia with him?  Did I hear that correctly?"  Lilley said, "No, please—don't tell anyone. I don't want to lose my job."

29.     In or around November of 2020, Lilley's mother's condition was deteriorating, so she asked Ospina if she could visit.  Ospina said, "No, we can't let you go because you run the desk."  Ospina said, "You also can't go because you don't have paid vacation."  Lilley insisted she did not care about pay.  She said, "I only want to visit my mother."  This point is buttressed by the fact that she was entitled to FMLA leave and had never missed a day of work.

30.     Lilley reported Ospina to Gomez who said, "Oh, don't worry.  That's just Miguel."

31.     Around November of 2020, Lilley reported Ospina's retaliation to Scott King ("King") G2's "Regional Human Resource Manager."

32.     Lilley had complained to King about Ospina's harassment many times throughout 2020-2021.  King would say things like, "Oh Ban, don't worry, we will take care of it," or "We're

gonna investigate."   However, nothing was ever "taken care of," and nothing was ever "investigated."   Consequently, Ospina's predatory and vindictive behavior to terminate Lilley continued notwithstanding G2 Securer's actual knowledge of same.

33.     In or around mid-December of 2020, Ospina forced Lilley to leave the United desk to go with him to lunch.  Lilley had zero interest.  Besides, she explained that she could not leave the desk unattended.  She said, "I can't leave the first-class desk unattended.  Can I ask [Katoa] first?"  Ospina said, "Just come with me, let's go get the food for the Holiday party."  Lilley was terrified of the consequences if she refused.

34.     Ospina repeatedly sexually assaulted Lilley in the car. Ospina rubbed and groped Lilley's thighs over her objections.  Plaintiff pushed Ospina's hands away, disgusted.  Ospina began rubbing her legs again.  Lilley once again pushed them away disgusted.  Now she was terrified.  Still Ospina did rubbed her legs a third time.  Lilley pushed his hands away again.

35.     Meanwhile, Katoa called Ospina and said, "Where's Ban? She left and never said anything."  When Lilley arrived back at the airport, Katoa asked Lilley why she went with Ospina.  She said, "He just grabbed me without letting me tell anyone.  I asked him if I could tell you."

36.     In or around late December of 2020, Ospina reassigned Lilley from the first-class international desk to baggage drop.  This area was designated for where baggage transported brought luggage to the planes.  Defendants did not service travelers in this area.  Katoa saw Lilley in this area and said, "What are you doing here?"  Lilley told Katoa Ospina sent her there and was looking to write her up.

37.     In or around early January of 2021, Ospina repeatedly told G2 and United employees that he was going to fire Lilley.  Multiple coworkers approached Lilley and advised her of same.  "Ban," they would say, "you need to watch out," or "Ban you're getting fired." This

terrified Lilley because she knew Ospina was capable of same.  Indeed, Lilley witnessed Ospina say he was going to fire Amy, repeatedly.  Around this time, Ospina terminated Eric and Paola.

38.     Lilley reported this to Katoa, and said that Amy and Joel were telling them he was going to terminate Lilley.  In turn, Katoa called Amy and Joel (last name unknown) to discuss why they were telling Lilley she was going to get fired.  However, Amy and Joel said, it was not them who was saying it, they reported the Ospina repeatedly told him that he was going to fire her.

39.     Afterwards, Katoa told Lilley, "Ban, [Ospina's] after you."

**Supervisor Ospina Initiates a Series of Faulty Reprimands, Seeking to Terminate Plaintiff's Employment After she Files HR Complaints**

40.     On or about January 7, 2021, Lilley complained to Gomez about Ospina's harassment and retaliation and that she feared he was going to terminate her employment.

41.     On or about January 8, 2021, Ospina formally reprimanded Lilley for a fabricated violation.  Ospina asked Lilley if she had checked-in a lady with the wrong boarding pass before leaving for lunch.  Lilley denied the accusation because she did not check anyone in other than a group of men.  Lilley showed this to Ospina in the sine system, which showed a different agent, under the identity of "2B," check the lady in.  Lilley said, "I am not 2B. I am 3B. That is not my sign. You are writing me up for no reason."  Ospina was so adamant on reprimanding Lilley that he said, "It's a glitch in the system.  It's you."  Ospina then began accusing Lilley of making a "a lot of mistakes," and asked, "Are you having problems at home?"  Lilley said that she worked hard, and was unaware of any mistakes that she had made.  Lilley said, "It's unfair that you are writing me up when the system shows it wasn't even me."  He said, "No, I'm writing you up," and forced Lilley to sign the reprimand."

42.     On or about January 11, 2021, Lilley complained to Gomez about the improper write-up.  Gomez said he would investigate, but after a week, no action was taken. Lilley called

Gomez once again, and he said, that he would investigate.  Thereafter, Ospina summoned Lilley to his office and explained that he would remove the write up because "we made a mistake." However, Ospina claimed he was not doing so because Gomez spoke with him, but that it was up to him.  Lilley said she was going to complain to Gomez. Ospina threatened Lilley saying, "Do you see [Gomez] here?"  He said, "He's even worse than me—he'll send you back here."

43.     On or about January 22, 2021, an agent made a similar mistake regarding the improper check-in of a guest, yet Ospina did not write up the agent.

44.     Meanwhile, Ospina would search through Lilley's trashcan looking for a reason to discipline her—there were none.

45.     On or about January 25, 2021, Ospina denied Lilley's request for a day off for a check up to a scheduled leg surgery.  Ospina denied Lilley's request despite submitting prior notice of her scheduled surgery, and never missing a day of work for an unjustified reason, like visiting her dying mother. Lilley was left with no choice but to take her first sick day for the first time in three years of employment.

46.     On or about January 28, 2021, Lilley swapped shifts with a Bianca Arciniegas under Eric's supervision.  Lilley's other managers, Amy and Ospina, were outraged because the swap form was not signed.  Neither Amy nor Ospina fulfilled their due diligence in determining whether this swap was valid because neither asked Eric if he approved the swap.  In an attempt to publicly humiliate Lilley, Amy and Ospina wrote on the Daily Exception Log—visible to all employees— that Lilley was working an unapproved shift.

47.     On or about February 3, 2021, Lilley detailed the above allegations in writing to Diana Schoeberl ("Schoeberl") G2's "HR Director—East Region." Schoeberl told Lilley she was also forwarding the information to Fernie Lopez.

48.     Shortly afterwards, in or around early February of 2021, Ospina retaliated against Lilley by reassigning her from the premier First-Class Desk to baggage drop.

49.     On or about February 16, 2021, Schoeberl emailed Lilley explaining King would be present, in person on or about February 18, 2021.

50.     Before King arrived, Gomez threatened Lilley and Katoa, telling them, "If you say anything to King, I'll make you pay."

51.     On or about February 18, 2021, King interviewed Lilley, including Katoa and Eric, and Ospina.  King also spoke with Paola and Mr. Yurian Rodriguez ("Rodriguez").

52.     Katoa told Lilley he told King what he believed was the truth.  Katoa told King Ospina was "after" Lilley, "targeting" her, going so far as "looking through her trash, trying to find reasons to fire her."

53.     On or about March 7, 2021, Lilley asked Ospina if she could have a day off for a doctor's appointment checking up on a leg surgery she had.  Ospina refused.  When Lilley went to her doctor, the doctor said, "If your job won't let you take the day off, you can request FMLA." This was the first time Lilley became aware of FMLA.

54.     Later on or about March 7, 2021, Lilley noticed a flyer posted at work citing a new telephone number to call regarding sick day requests: Ospina's personal line.

55.     In or around March of 2021, Lilley had a panic attack, was hospitalized and diagnosed with anxiety and depression because of the relentless harassment, retaliation.

56.     On or about March 10, 2021, Rodriguez approached Lilley and said, "Per Miguel [Ospina], you have to do the international desk at the last station."  Lilley began crying.  That was unheard of.  Doing this alone was not per policy.  Besides, this was the area where the baggage crew ate and drank coffee, and there was never a customer in sight.

**Plaintiff's Constructive Discharge Following G2's Failure to Take Corrective Action**

57.     On or about March 14, 2021, Lilley called King to multiple times.  "We're still working on it, still investigating things."  She explained, "I go to work crying, and leave on the verge of a panic attack every day."  She said, "I've even been hospitalized due to this."

58.     On or about March 15, 2021, Lilley sent a text message to King:

> I just wanted to inform you that there was a flyer at work stating that the phone number for calling in sick changed.  I called this number last night and it came up as Miguel's personal cell phone.  This shows the level of control and manipulation he has.  I left a message on that line to inform that I could not make it. This all happened after I got my FMLA. This was very scary and I wanted to report to you immediately. I am afraid for my life at this point.  Miguel will stop at nothing to control, harass and intimidate me …. Please call me when you have a second to talk thank you so much.

59.     King did not respond to Lilley's reported retaliation.

60.     On or about March 18, 2021, Lilley texted King again.  She said, "I also would like to see if there is any update with the investigation … I'm right now [being] treated with anxiety and depression over what's going on[.] I want to know what happened of the investigation."

61.     King responded later on March 18, 2021 and said, "I have completed the investigation and have given all of the information to Diane (Schoeberl) to review and discuss.  I can't address it yet with you but as soon as I can I will.  Please don't worry."

62.     However, Lilley repeatedly contacted Schoeberl for the results of the investigation, but Schoeberl never provided same.

63.     Meanwhile, Ospina continued intimidating Lilley, seething at her every time she saw him.  Plaintiff began crying to Rodriguez who saw that she was fearful and explained that no investigation corrected the situation.

64.     Consequently, Lilley resigned from intolerable working conditions, a failure to provide the results of a purported investigation, amid ongoing adverse actions taken by Ospina

even after he was told he was under investigation.  This point is buttressed by the fact that Ospina had allegedly separated from American Airlines after multiple sexual harassment accusations, and G2 was aware of same upon hiring him. Lilley was terrified even to provide her badge upon her constructive discharge because she feared Ospina would use it for his malicious purposes, and attempt to sabotage her career.

65.    G2 unlawfully discriminated against Plaintiff because of her sex and because she opposed and complained about unlawful employment practices perpetrated against Plaintiff because of her sex.

66.    At bottom, G2 is liable for violating Plaintiff's personal dignity, and depriving Plaintiff of her civil right to pursue an equal employment opportunity.

67.    The above are just some of the examples of unlawful discrimination and retaliation G2 Secure subjected Plaintiff to on a continuous and on-going basis throughout her employment.

68.    Defendants have damaged Plaintiff, and she is entitled to relief.

## CAUSES OF ACTION

### COUNT I
**Title VII, 42 U.S.C. § 2000e-2(a)**
**Hostile Work Environment**
**(Against Defendant G2 Secure)**

69.    Plaintiff reincorporates the allegations in paragraphs 11-68.

70.    Plaintiff is a woman and therefore is a member of a protected class.

71.    Plaintiff was subjected to unwelcome, humiliating harassment and abuse because of her sex, and Defendants failed to take corrective action to prevent same.

72.    Ospina, Plaintiff's immediate supervisor, repeatedly made unwanted sexual advances towards Plaintiff, which interfered with Plaintiff's job performance, or otherwise altered the terms and conditions of her employment as alleged herein.

73.     For example, from August of 2019 to December of 2020, Ospina would summon Plaintiff to his office and proposition her to go to Colombia with him, repeatedly.  Each time, Plaintiff objected to his advances, and stated she had work to get to—guests at the check in counter unattended, for instance.  Ospina's sexual advances interfered with Plaintiff's employment because he conditioned days off in exchange for Plaintiff's submission to his sexual desires.  For example, Ospina said, "I'll do anything.  I'll give you days off.  *Any day you want* … even 'black days,'" the busiest travel days which Plaintiff was not entitled to take off per policy.

74.     Plaintiff's coworkers saw Ospina hover over her, and stare at her, and on one occasion, Paola, Plaintiff's coworker, said, "Did [Ospina] ask you to go to Colombia with him? Did I hear that correctly?"

75.     Ospina denied Lilley time off—which she was entitled to—so she could visit her dying mother.  Lilley would ask, "May I go see my sick mom in Michigan?"  Ospina said, "Only if I can come with you and see your family."  Plaintiff refused.  At no point did Ospina mention that Lilley was entitled to time off to care for her dying mother, but allowed her to go only if he could go with her.  Later, Plaintiff again requested if she could visit her dying mother.  Ospina said, "No, we can't let you go because you run the desk."  Ospina said, "You also can't go because you don't have paid vacation."  Lilley insisted she did not care about pay.  She said, "I only want to visit my mother."

76.     Ospina unreasonably interfered with Plaintiff's work duties for his sexual interests in Plaintiff.  For instance, Ospina told her to abandon the first-class international desk in December of 2020.  Once in the car, Ospina repeatedly groped Plaintiff's legs and thighs over her objection, continuing to assault her each time she pushed his hands away.  Consequently, Katoa noticed Lilley had left the desk and called Ospina asking where she was.

77. G2 secure was aware of Ospina's contact because he is an agent of G2 as Plaintiff's supervisor and because Plaintiff repeatedly reported Ospina's conduct to G2 secure failed to take corrective action in the face of actual knowledge of Plaintiff's allegations against Ospina.

78. Plaintiff contacted United's Human Resources—as she was instructed to do during her training at United's in Chicago—but she was told, "Ban I'm so sorry, but we can't do anything."

79. After Ospina, learned Plaintiff had reported him, and King was coming to Miami, Ospina threatened Plaintiff and others, saying, that he would make them "pay," if they said anything to King regarding the allegations.

80. Plaintiff never was informed of the purported investigation's outcome, and she was faced with no other choice but to resign in light of G2's failure to take corrective action, or even an effort to apprise Plaintiff of their findings of the investigation, to the extent such exists.

81. Taken together, these allegations give rise to the reasonable inference that Defendant G2 violated Title VII by subjecting Plaintiff to a hostile work environment because of her sex.

82. As an actual and proximate result of the G2's unlawful employment practices in violation of the Title VII, Plaintiff has suffered damages.

## COUNT II
### FCRA § 760.10(1)(a)
### Hostile Work Environment – Sex
### (Against Defendant G2 Secure)

83. Plaintiff reincorporates the allegations in paragraphs 11-68.

84. Plaintiff is a woman and therefore is a member of a protected class.

85. Plaintiff was subjected to unwelcome, humiliating harassment and abuse because of her sex, and Defendants failed to take corrective action to prevent same.

86.     Ospina, Plaintiff's immediate supervisor, repeatedly made unwanted sexual advances towards Plaintiff, which interfered with Plaintiff's job performance, or otherwise altered the terms and conditions of her employment as alleged herein.

87.     For example, from August of 2019 to December of 2020, Ospina would summon Plaintiff to his office and proposition her to go to Colombia with him, repeatedly.  Each time, Plaintiff objected to his advances, and stated she had work to get to—guests at the check in counter unattended, for instance.  Ospina's sexual advances interfered with Plaintiff's employment because he conditioned days off in exchange for Plaintiff's submission to his sexual desires.  For example, Ospina said, "I'll do anything.  I'll give you days off.  *Any day you want* … even 'black days,'" the busiest travel days which Plaintiff was not entitled to take off per policy.

88.     Plaintiff's coworkers saw Ospina hover over her, and stare at her, and on one occasion, Paola, Plaintiff's coworker, said, "Did [Ospina] ask you to go to Colombia with him? Did I hear that correctly?"

89.     Ospina denied Lilley time off—which she was entitled to—so she could visit her dying mother.  Lilley would ask, "May I go see my sick mom in Michigan?"  Ospina said, "Only if I can come with you and see your family."  Plaintiff refused.  At no point did Ospina mention that Lilley was entitled to time off to care for her dying mother, but allowed her to go only if he could go with her.  Later, Plaintiff again requested if she could visit her dying mother.  Ospina said, "No, we can't let you go because you run the desk."  Ospina said, "You also can't go because you don't have paid vacation."  Lilley insisted she did not care about pay.  She said, "I only want to visit my mother."

90.     Ospina unreasonably interfered with Plaintiff's work duties for his sexual interests in Plaintiff.  For instance, Ospina told her to abandon the first-class international desk in December

of 2020.  Once in the car, Ospina repeatedly groped Plaintiff's legs and thighs over her objection, continuing to assault her each time she pushed his hands away.  Consequently, Katoa noticed Lilley had left the desk and called Ospina asking where she was.

91.     G2 secure was aware of Ospina's contact because he is an agent of G2 as Plaintiff's supervisor and because Plaintiff repeatedly reported Ospina's conduct to G2 secure failed to take corrective action in the face of actual knowledge of Plaintiff's allegations against Ospina.

92.     Plaintiff contacted United's Human Resources—as she was instructed to do during her training at United's in Chicago—but she was told, "Ban I'm so sorry, but we can't do anything."

93.     After Ospina, learned Plaintiff had reported him, and King was coming to Miami, Ospina threatened Plaintiff and others, saying, that he would make them "pay," if they said anything to King regarding the allegations.

94.     Plaintiff never was informed of the purported investigation's outcome, and she was faced with no other choice but to resign in light of Defendants' failure to take corrective action, or even an effort to apprise Plaintiff of their findings of the investigation, to the extent such exists.

95.     Taken together, the above gives rise to the plausible inference that Defendant G2 violated the FCRA by subjecting Plaintiff to a hostile work environment because of her sex.

96.     As an actual and proximate result of the Defendant G2's unlawful employment practices in violation of the FCRA, Plaintiff has suffered damages.

### COUNT III
### Title VII, U.S.C. § 2000e-3(a)
### Retaliatory Hostile Work Environment
### (Against Defendant G2 Secure)

97.     Plaintiff reincorporates the allegations in paragraphs 18-68.

98.     Alternatively, Plaintiff was subjected to a retaliatory hostile work environment because she engaged in protected activity by opposing Ospina's unwanted advances informally, and by filing a complaint with Defendants.

99.     Plaintiff engaged in protected activity; Plaintiff engaged in protected activity by complaining to Ospina directly that she was not interested in having a sexual relationship with him under any circumstance.  Likewise, Plaintiff engaged in protected activity by reporting Ospina G2 Secure and United personnel.  Plaintiff's opposition to Ospina's sexual advances was made in good faith and was objectively and subjectively reasonable.

100.    Any reasonable person in Plaintiff's position would reasonably believed that a supervisor repeatedly seeking a sexual relationship with a subordinate, hovering over, luring the employee into his office, offering her job benefits in exchange for submitting to sexual demands, groping her legs over her objections, and suffering job consequences for rejecting the supervisor, could likely have violated Title VII.

101.    After Plaintiff engaged in protected activity, Plaintiff was subjected to unwelcome harassment, of which her protected activity was a but-for cause.  After Plaintiff rejected Ospina's unwanted sexual advances, Ospina initiated a series of retaliatory events because Plaintiff rejected his advances.

102.    For example, when Plaintiff requested time off to care for her dying mother in Michigan, Ospina said she could go if he came with him, or otherwise denied her requests because she opposed his unwanted sexual advances.

103.    In or around late December of 2020, days after Lilley reported Ospina to Katoa, Ospina reassigned Lilley from the first-class international desk to baggage drop.  Around this time,

Ospina began searching Plaintiff's trash can searching for reasons to reprimand Plaintiff, which there was none.

104.     In or around early January of 2021, Ospina repeatedly told G2 and United employees that he was going to fire Lilley.

105.     On or about January 7, 2021, Lilley complained to Gomez about Ospina's harassment and retaliation and that she feared he was going to terminate her employment.  On or about January 8, 2021, Ospina formally reprimanded Lilley for a fabricated violation.

106.     On or about February 3, 2021, Lilley detailed the above allegations in writing to Schoeberl.  Shortly afterwards, in or around early February of 2021, Ospina retaliated against Lilley by reassigning her from the premier First-Class Desk to baggage drop.

107.     After Ospina learned King would come to Miami after Lilley complained, Ospina told Lilley, "If you say anything, I'll make you pay."

108.     On or about March 10, 2021, after Plaintiff provided her statement about Ospina's harassment to King, Rodriguez approached Lilley and said, "Per Miguel [Ospina], you have to do the international desk at the last station."

109.     The above-alleged harassment was such that it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.

110.     A basis exists for holding G2 liable either directly or vicariously because Opsina, Plaintiff's supervisor—an agent of G2—subjected Plaintiff to the above-described harassment, or because G2 otherwise had actual knowledge of the above-described harassment as reported by Plaintiff.

111.     Taken together, these allegations support the reasonable inference that G2 violated Title VII by subjecting Plaintiff to a retaliatory hostile work environment.

112.     Plaintiff has suffered damages as a result of G2's violations of Title VII.

**COUNT IV**
**FCRA§ 760.10(7)**
**Retaliatory Hostile Work Environment**
**(Against Defendant G2 Secure)**

113.     Plaintiff reincorporates the allegations in paragraphs in 18-68.

114.     Alternatively, Plaintiff was subjected to a retaliatory hostile work environment because she engaged in protected activity by opposing Ospina's unwanted advances informally, and by filing a complaint with Defendants.

115.     Alternatively, Plaintiff was subjected to a retaliatory hostile work environment because she engaged in protected activity by opposing Ospina's unwanted advances informally, and by filing a complaint with Defendants.

116.     Plaintiff engaged in protected activity; Plaintiff engaged in protected activity by complaining to Ospina directly that she was not interested in having a sexual relationship with him under any circumstance.  Likewise, Plaintiff engaged in protected activity by reporting Ospina G2 Secure and United personnel.  Plaintiff's opposition to Ospina's sexual advances was made in good faith and was objectively and subjectively reasonable.

117.     Any reasonable person in Plaintiff's position would reasonably believed that a supervisor repeatedly seeking a sexual relationship with a subordinate, hovering over, luring the employee into his office, offering her job benefits in exchange for submitting to sexual demands, groping her legs over her objections, and suffering job consequences for rejecting the supervisor, could likely have violated Title VII.

118.     After Plaintiff engaged in protected activity, Plaintiff was subjected to unwelcome harassment, of which her protected activity was a but-for cause.  After Plaintiff rejected Ospina's

unwanted sexual advances, Ospina initiated a series of retaliatory events because Plaintiff rejected his advances.

119.    For example, when Plaintiff requested time off to care for her dying mother in Michigan, Ospina said she could go if he came with him, or otherwise denied her requests because she opposed his unwanted sexual advances.

120.    In or around late December of 2020, days after Lilley reported Ospina to Katoa, Ospina reassigned Lilley from the first-class international desk to baggage drop.  Around this time, Ospina began searching Plaintiff's trash can searching for reasons to reprimand Plaintiff, which there was none.

121.    In or around early January of 2021, Ospina repeatedly told G2 and United employees that he was going to fire Lilley.

122.    On or about January 7, 2021, Lilley complained to Gomez about Ospina's harassment and retaliation and that she feared he was going to terminate her employment.  On or about January 8, 2021, Ospina formally reprimanded Lilley for a fabricated violation.

123.    On or about February 3, 2021, Lilley detailed the above allegations in writing to Schoeberl.

124.    Shortly afterwards, in or around early February of 2021, Ospina retaliated against Lilley by reassigning her from the premier First-Class Desk to baggage drop.

125.    After Ospina learned King would come to Miami after Lilley complained, Ospina told Lilley, "If you say anything, I'll make you pay."

126.    On or about March 10, 2021, after Plaintiff provided her statement about Ospina's harassment to King, Rodriguez approached Lilley and said, "Per Miguel [Ospina], you have to do the international desk at the last station."

127.    The above-alleged harassment was such that it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.

128.    A basis exists for holding G2 liable either directly or vicariously because Opsina, Plaintiff's supervisor—an agent of G2—subjected Plaintiff to the above-described harassment, or because G2 otherwise had actual knowledge of the above-described harassment as reported by Plaintiff.

129.    Taken together, these allegations give rise to the reasonable inference that Defendants are liable for violating the FCRA.

130.    As a result of the Defendants' employment practices in violation of the FCRA, Plaintiff has suffered damages.

## COUNT V
### Title VII, 42 U.S.C. § 2000e-3(a)
### Retaliation
### (Against Defendant G2 Secure)

131.    Plaintiff reincorporates the allegations in paragraphs 18-68.

132.    Alternatively, G2 violated Title VII by discriminating against Plaintiff because she opposed employment practices which she reasonably and in good faith believed were in violation of Title VII.

133.    Plaintiff engaged in protected activity by opposing Ospina's unwanted sexual advances when he repeatedly invited her to Colombia, or when he insisted on going to Michigan with Plaintiff to see her dying mother.  Plaintiff engaged in protected activity by complaining about Ospina to other managers and supervisors, and human resources, including King, Eric, Gomez, and Schoerbel.

134.    Plaintiff suffered materially adverse actions because Ospina denied Plaintiff's requests to visit her dying mother; groped her legs over her objection, after rejecting his prior

sexual advances; initiated a series of faulty, unsubstantiated write ups; reassigned Plaintiff from the first class desk to baggage drop; threatened Plaintiff that if she told King anything she "would pay"; assigned her to work the international desk on her own; Plaintiff left work crying daily throughout February and March of 2021, left on the verge of panic attacks, and was hospitalized.

135.    On or about January 7, 2021, Lilley complained to Gomez about Ospina's harassment and retaliation and that she feared he was going to terminate her employment.  On or about January 8, 2021, Ospina formally reprimanded Lilley for a fabricated violation.

136.    On or about February 3, 2021, Lilley detailed the above allegations in writing to Schoeberl.  Shortly afterwards, in or around early February of 2021, Ospina retaliated against Lilley by reassigning her from the premier First-Class Desk to baggage drop.

137.    After Ospina learned King would come to Miami after Lilley complained, Ospina told Lilley, "If you say anything, I'll make you pay." On or about March 10, 2021, Rodriguez approached Lilley and said, "Per Miguel [Ospina], you have to do the international desk at the last station."

138.    Plaintiff suffered adverse actions because she was reassigned to other duties which with significantly less responsibilities.  Plaintiff suffered adverse actions because she was constructively discharged because she engaged in protected activity.  Plaintiff's constructive discharge was motivated by retaliation for opposing and reporting Ospina's sexual harassment.

139.    The above-described adverse actions are causally connected to Plaintiff's protected activity because the events are not wholly unrelated.  Ospina was aware of Plaintiff's opposition to his sexual advances when he thereafter continued subjecting her to unwanted sexual advances, oftentimes, minutes afterwards.  Ospina was aware of Plaintiff's complaints about him to Gomez on or about January 8, 2021, when he reprimanded Plaintiff for faulty writeups after she reported

him to on or about January 7, 2021.  G2 was aware that Plaintiff repeatedly asked for status updates regarding the investigation, and complained that Ospina was continuing to harass her, assign her different duties, and continued to search for ways to terminate her employment, and reporting his desire to do same to others.

140.    Taken together, the above allegations give rise to the plausible inference that G2 secure subjected Plaintiff to unlawful retaliation in violation of Title VII.

141.    As a result of G2's violation of Title VII, Plaintiff has suffered damages.

**COUNT VI**
**FCRA § 760.10(7)**
**Retaliation**
**(Against Defendant G2 Secure)**

142.    Plaintiff reincorporates the allegations in paragraphs 18-68.

143.    Alternatively, G2 violated Title VII by discriminating against Plaintiff because she opposed employment practices which she reasonably and in good faith believed were in violation of the FCRA.

144.    Plaintiff engaged in protected activity by opposing Ospina's unwanted sexual advances when he repeatedly invited her to Colombia, or when he insisted on going to Michigan with Plaintiff to see her dying mother.  Plaintiff engaged in protected activity by complaining about Ospina to other managers and supervisors, and human resources, including King, Eric, Gomez, and Schoerbel.

145.    Plaintiff suffered materially adverse actions because Ospina denied Plaintiff's requests to visit her dying mother; groped her legs over her objection, after rejecting his prior sexual advances; initiated a series of faulty, unsubstantiated write ups; reassigned Plaintiff from the first class desk to baggage drop; threatened Plaintiff that if she told King anything she "would

pay"; assigned her to work the international desk on her own; Plaintiff left work crying daily throughout February and March of 2021, left on the verge of panic attacks, and was hospitalized.

146.    On or about January 7, 2021, Lilley complained to Gomez about Ospina's harassment and retaliation and that she feared he was going to terminate her employment.  On or about January 8, 2021, Ospina formally reprimanded Lilley for a fabricated violation.  After Ospina learned King would come to Miami after Lilley complained, Ospina told Lilley, "If you say anything, I'll make you pay." On or about March 10, 2021, Rodriguez approached Lilley and said, "Per Miguel [Ospina], you have to do the international desk at the last station."

147.    Plaintiff suffered adverse actions because she was reassigned to other duties which with significantly less responsibilities.  Plaintiff suffered adverse actions because she was constructively discharged because she engaged in protected activity.  Plaintiff's constructive discharge was motivated by retaliation for opposing and reporting Ospina's sexual harassment.

148.    The above-described adverse actions are causally connected to Plaintiff's protected activity because the events are not wholly unrelated.  Ospina was aware of Plaintiff's opposition to his sexual advances when he thereafter continued subjecting her to unwanted sexual advances, oftentimes, minutes afterwards.  Ospina was aware of Plaintiff's complaints about him to Gomez on or about January 8, 2021, when he reprimanded Plaintiff for faulty writeups after she reported him to on or about January 7, 2021.  G2 was aware that Plaintiff repeatedly asked for status updates regarding the investigation, and complained that Ospina was continuing to harass her, assign her different duties, and continued to search for ways to terminate her employment, and reporting his desire to do same to others.

149.    Taken together, these allegations give rise to the reasonable inference that G2 retaliated against Plaintiff in violation of the FCRA.

150.     As a result of G2's retaliation, Plaintiff has suffered damages.

**COUNT VII**
**Battery**
**(Against Defendant Ospina)**

151.     Plaintiff reincorporates the allegations contained in paragraphs 33-34.

152.     Defendant Ospina committed a battery against Plaintiff by intentionally inflicting harmful or offensive contact upon Plaintiff with the intent to cause such contact.

153.     Defendant Ospina's intentional conduct was unlawful because it caused an imminent apprehension in Plaintiff of unwanted sexual contact, and, as explained in greater detail above, and described below, it did in fact result in such contact.

154.     In or around mid-December of 2020, Defendant Ospina repeatedly groped Plaintiff's legs over her objection in his car.

155.     Plaintiff was emotionally and physical harmed after Ospina's touching.

156.     These contacts placed Plaintiff in imminent apprehension of contact that was unwanted, offensive, and actually occurred by Ospina's intentional actions.

157.     To be sure, Defendant Ospina made unwanted, harmful and offensive conduct with Plaintiff's legs and thighs for the specific purpose and intent of causing harm to Plaintiff, and such harm did in fact occur as a result of such conduct.

158.     As a direct and proximate result of Ospina's battery on Plaintiff, Plaintiff has suffered damages.

159.     Defendant Ospina's above-described actions were knowing, intentional, willful, malicious, and in reckless disregard of Plaintiff's protected rights, and thus support an award of punitive damages under Florida law is appropriate.

160.     Defendant Ospina has damaged Plaintiff as a result of his intentional battery.

## COUNT VIII
## Assault
## (Against Defendant Ospina)

161.    Plaintiff reincorporates the allegations contained in paragraphs 33-34.

162.    Defendant Ospina placed Plaintiff in apprehension of imminent harmful or offensive contact with Defendant Ospina in mid-December of 2020 in his car.

163.    Defendant Ospina had the actual and apparent authority to carry out his intent to pursue unwanted sexual contact with Plaintiff because Defendant Ospina placed Plaintiff in incredible fear of unwanted contact by repeatedly groping her legs and thighs after she attempted to defend his contacts.

164.    Defendant Ospina's repeated contacts created reasonable fear of imminent peril upon Plaintiff each time he continued groping her.

165.    As a direct and proximate result of Defendant's assault on Plaintiff, Plaintiff has suffered damages.

166.    Defendant Ospina's above-described actions were knowing, intentional, willful, malicious, and in reckless disregard of Plaintiff's protected rights to support an award of punitive damages under Florida law.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff demands judgment against Defendants, respectively:

A.      As against Defendant G2 Secure, pursuant to Title VII § 102(b)(3) and FCRA § 760.11(5), an award of damages in an amount to be determined at trial, plus prejudgment interest to compensate Plaintiff for all monetary and/or economic damages, including, but not limited to, the loss of past and future income, wages, compensation, job security and other benefits of employment;

B.     As against Defendant G2 Secure, pursuant to Title VII § 102(b)(3) and FCRA § 760.11(5), an award of damages in an amount to be determined at trial, plus prejudgment interest to compensate Plaintiff for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses

C.     As against Defendant G2 Secure, pursuant to Title VII § 102(b)(3) and FCRA § 760.11(5), an award of punitive damages for damages arising from discriminatory employment practices, with malice or with reckless indifference to Plaintiff's rights.

D.     As against Defendant G2 Secure, pursuant to Title VII § 103 and FCRA § 760.11(5), an award of costs that Plaintiff has incurred in this Action, as well as Plaintiff's reasonable attorneys' fees plus interest to the fullest extent permitted by law;

E.     As against Defendant Ospina, an award of damages in an amount to be determined at trial, plus prejudgment interest to compensate Plaintiff for pecuniary losses, emotional pain and suffering, mental anguish, and loss of enjoyment of life;

F.     As against Defendant Ospina, an award of uncapped punitive damages because Ospina had a specific intent to harm Plaintiff, and because Ospina's conduct did in fact harm Plaintiff;

G.     Such other and further relief the Court deems just and proper.

## <u>JURY DEMAND</u>

Plaintiff hereby demands a jury trial of all issues so triable pursuant to Rule 38 of the

Federal Rules of Civil Procedure and Section 102 of the Civil Rights Act of 1991.

Dated: April 18, 2022

                        Respectfully submitted,

                        */s/ **Brett D. Kaplan**        *
                        Brett D. Kaplan, Esq.
                        Florida Bar No. 1031866
                        brett@dereksmithlaw.com
                        **DEREK SMITH LAW GROUP, PLLC**
                        701 Brickell Ave., Suite 1310
                        Miami, Florida 33131
                        Telephone: (305) 946-1884
                        Facsimile: (305) 503-6741
                        *Attorneys for Plaintiff Ban Lilley*